LOGUE, J.
In the early morning hours of January 6, 2003, Lidia Giangrandi was murdered in her home by a burglar. Her estate brought a wrongful death action against her alarm company and against 50 State *1130 Security Service, Inc. (“the security company”), which contracted to provide security to the gated community where she lived. The jury found the security company and the alarm company to be equally at fault. The security company subsequently moved for a new trial, arguing that the jury verdict was against the manifest weight of the evidence and that certain evidence was improperly excluded. The motion was denied and the security company appealed. Because competent substantial evidence, including the murderer’s sworn statement to the police, sufficiently linked the crime to the time and place when a breakdown in the security occurred, we conclude that the trial judge did not abuse his discretion in denying the motion for a new trial. We accordingly affirm.
FACTS AND PROCEDURAL HISTORY
On the night of the murder, Giangrandi lived in a gated community with security services provided pursuant to a special taxing district. The community is a neighborhood of six streets that is surrounded by a golf course and a lake, such that vehicular entry to the community is provided by a single access road. A guardhouse is located on the access road. Two guards are stationed at the community twenty-four hours a day, seven days a week. One guard is posted at the guardhouse, and another roving guard patrols in a vehicle with overhead flashing lights.
Much of the dispute in this case concerns the whereabouts of the security company’s roving guard during the two crucial hours leading up to the murder, from 1:00 a.m. to 3:00 a.m. The roving guard’s instructions require that “patrolling shall be done continuously.” During the patrol, the roving guard clocks into four different checkpoints (called “Deggy” points) distributed at various locations in the community to ensure he is actively patrolling. One checkpoint is located at the guardhouse; another near Giangrandi’s home; two others are located elsewhere in the community.
Giangrandi’s murderer was quickly captured by police and convicted of his crime. Although he did not testify in this case, his sworn statement confessing to the crime, given to the police within three days of the murder, was admitted into evidence.[1] The murderer stated he had no knowledge of Giangrandi, her house, or her neighborhood before the night of the murder. He entered the gated community on a bicycle through an open pedestrian path, looking for a way to address his constant financial problems. While touring the community, he noticed a small window on the side of a home that was open several inches. For two hours, from 1:00 a.m. to 3:00 a.m., he waited outside of the home trying to decide whether to break in. After making the decision to break in, he cut the screen of the open window with a piece of metal he found in the yard. The screen included security wires, but the alarm did not go off. It was later learned the alarm company improperly installed the alarm. He entered the home and, in the course of stealing credit cards and other items, unexpectedly encountered Giangrandi and strangled her to keep her silent. The murder occurred at approximately 3:00 a.m.
As noted above, Giangrandi’s estate brought a wrongful death action against the alarm company and the security company. The alarm company settled with the estate prior to trial. As a result, the case went to trial against the security company as the sole defendant, with the alarm *1131 company on the verdict as a Fabre[2] defendant.
At trial, the estate presented testimony that a breakdown in patrolling occurred on the night of the murder. An expert for the estate interpreted the roving guard’s instructions to patrol “continuously” to mean the roving guard must be continually moving. He testified that this standard was violated. He explained that he measured the actual time required to patrol this particular security district. Based on his calculations, the roving guard should have clocked into the checkpoint nearest Gian-grandi’s home at least eight times had he been patrolling continuously during the crucial two hours. The security company’s records, however, demonstrated that the roving guard clocked into that checkpoint only twice during the crucial two hours. He also testified the roving guard improperly spent thirty minutes of the two crucial hours parked at the guardhouse in the company of the other guard, rather than patrolling the streets. He testified that a further breach occurred when the roving guard dropped off the checkpoint system entirely from 2:29 a.m. to 4:19 a.m.
To a large degree, this opinion testimony was corroborated by the testimony of the security company’s vice president. First, he testified that the purpose of the checkpoints or Deggy points was to audit the movement of the guards. Second, he testified that the roving guard was required to clock into all checkpoints within a regular timeframe, which he gave as every hour or hour and a half, although he admitted that he had never measured the actual time required to patrol this particular security district. He also testified that the roving guard was expected to keep moving and would be allowed to stop moving only “if the officer is filling out an incident report,” or “if he overheard or had seen something that might arouse his suspicions.” He did not know any reason why the roving patrol would have stopped on the night in question.[3]
Most important, the vice president testified that the roving guard’s failure to register at any checkpoint for over an hour and a half, from 2:29 a.m. to 4:19 a.m., did not comport with the security company’s own expectation that the roving guard regularly clock into the checkpoints. Asked about the fact that the roving guard failed to clock into any checkpoint during this crucial time when the burglary occurred, he testified:
Q. That’s not in compliance with your expectations, is it?
A. No.
Q. And you would agree with me, would you not, that the reason that you put in the Deggy points in the system is so that you could assure yourself that the guards are constantly moving or that they are at *1132 the location where they say they are going to be, is that fair?
That is correct. ¡>
And that’s the purpose of the Deg-¿O
gy points?
That’s why we installed them. \>
And that was 50 State’s purpose of putting in the Deggy points? <0
That’s correct. !>
Both of the estates experts testified that the breakdown in patrolling allowed the burglary to occur. In this regard, the estate’s experts characterized the murderer as an unsophisticated, opportunistic thief. Among other things, the experts noted that the murderer failed to bring burglary tools and carelessly left DNA evidence on the window. Relying on the murderer’s sworn statement to the police, they further explained that the murderer acted on impulse once he noticed Gian-grandi’s open window. In light of this evidence, the estate’s experts testified that the murderer fit the profile of someone who would be easily detected or deterred by a roving guard properly patrolling in a vehicle with overhead flashing lights.
The security company put up an aggressive defense. Notwithstanding the testimony of the vice president, the security company’s expert interpreted the roving guard’s instructions to patrol “continuously” to mean intermittent, stop-and-go, irregular movement that avoided patterns detectable by potential criminals. In light of his interpretation, the expert concluded there was no significance to the facts that the roving guard clocked into the checkpoint nearest Giangrandi’s home only twice during the crucial two hours, and dropped off the checkpoint system entirely from 2:29 a.m. to 4:19 a.m., when the break-in and murder occurred.
The security company’s expert also testified that any breakdown in patrolling could not have been the cause of the crime because the murderer was the type of criminal who was difficult to deter. The expert’s many reasons for this conclusion are ably summarized by the dissent. His ultimate reason stemmed from his conclusion that the burglary was not a crime of opportunity. Instead, the murderer was targeting Giangrandi on the night of the murder. Because the murderer was specifically targeting Giangrandi as his victim, the security company’s expert testified, the crime was “[n]ot deterrable by reasonable or routine security. You [would] need a SWAT team or the 82nd Airborne out there or something [to deter this burglary].”[4]
Giangrandi was targeted in such an extraordinary manner, the expert believed, because she was involved in charitable work to help the homeless. The trial court prohibited the expert from testifying to this basis of his opinion, however, because “the prejudice would substantially outweigh the probative value of this testimony, based upon the fact that it would be pure speculation to connect the inference that she was working with the homeless *1133 and the fact that an individual perpetrates a crime.”
The jury found the security company and the alarm company to be equally at fault and awarded non-economic damages to Giangrandi’s three adult children, totaling $4,780,000. Following the verdict, the security company moved for a new trial. The motion was denied. This appeal followed.
ANALYSIS
I. Motion for New Trial Based on Manifest Weight of the Evidence
A. Standard of Review
A motion for new trial based on the claim that a jury verdict is against the manifest weight of the evidence is somewhat unique in our jurisprudence. The trial court is not limited to merely reviewing the record to determine if the verdict is supported by competent, substantial evidence. Brown v. Estate of Stuckey, 749 So.2d 490, 496 (Fla.1999). Instead, the trial court must take into account “[its] contact with the trial and [its] observation of the behavior of those upon whose testimony the finding of fact must be based.” Id. (citing Cloud v. Fallis, 110 So.2d 669, 673 (Fla.1959)). In this regard, the trial judge has “broad discretion” to engage in some limited reweighing of the evidence to determine if the verdict was so contrary to the weight of the evidence that it constituted a “miscarriage of justice” or “unjust verdict.” Brown, 749 So.2d at 495. The rationale for the trial court’s extraordinary discretion in this regard is that it supplies “the only check against a jury that has reached an unjust decision on the facts.” Id. In doing so, however, “[t]he role of the trial judge is not to substitute his or her own verdict for that of the jury, but to avoid what, in the judge’s trained and experienced judgment, is an unjust verdict.” Id.
On the other hand, an appellate court reviewing the denial of a motion for a new trial cannot engage in any reweighing of the evidence because it had no contact with the trial and no observation of the behavior of those upon whose testimony the finding of fact must be based. In other words, an appellate court reviewing the denial of a motion for new trial is not reviewing whether or not the verdict was against the manifest weight of the evidence. Dewitt v. Maruhachi Ceramics of Am., Inc., 770 So.2d 709, 711 (Fla. 5th DCA 2000). It is, instead, reviewing only whether the trial court abused its discretion in denying a new trial. Id. If a review of the record establishes that conflicting evidence was presented at trial, an appellate court cannot conclude that a trial court abused its discretion in denying the motion. Weatherly v. Louis, 31 So.3d 803, 805-06 (Fla. 3d DCA 2009).
B. Breach
The security company argues that the jury’s finding of a breach of duty was against the manifest weight of the evidence. After carefully reviewing the testimony, however, we conclude the trial judge did not abuse his discretion in denying a new trial on this ground.
In examining the evidence regarding the security company’s breach of its duty to patrol continuously, the crucial two-hour period runs from 1:00 a.m., when the murderer first saw the open bathroom window and stopped outside Giangrandi’s home, to 3:00 a.m., when the murderer cut the window screen and climbed inside the house. The jury could have credited record evidence indicating: (1) the roving guard was in the guardhouse and not patrolling from approximately 1:00 a.m. to 1:35 a.m.; (2) the roving guard disappeared off the *1134 checkpoint system entirely from 2:29 a.m. to 4:19 a.m.; and (3) the roving guard patrolled past Giangrandi’s home only twice during the crucial two-hour period, even though he should have patrolled past the home at least eight times if he had been patrolling continuously. These facts were sufficient to support a jury question on the issue of whether the security company breached its duty to patrol continuously.
The security company maintains, and the dissent agrees, that the security company’s use of the checkpoint system to monitor the movements of the roving guard was not required by the contract between the security company and the guard district. Therefore, the security company argues, the checkpoint system is irrelevant to prove the roving guard was not patrolling as expected. Florida law, however, recognizes that the violation of a party’s internal policies can be evidence of its negligence. See Marks v. Mandel, 477 So.2d 1036, 1038-39 (Fla. 3d DCA 1985) (holding that a hospital’s emergency room policy manual was relevant to issue of the hospital’s negligence, specifically whether the hospital responded in a timely and appropriate manner to the needs of a patient with a gunshot wound); Moyer v. Reynolds, 780 So.2d 205, 208-09 (Fla. 5th DCA 2001) (holding that it was reversible error to exclude evidence of internal policies of a hospital emergency room, where policies were not followed and, therefore, provided evidence of negligence).
Admittedly, the security company offered expert testimony that conflicted with the estate’s expert testimony on the issue of whether the security company breached its duty. But where there is conflicting evidence, an appellate court will not overrule a trial judge’s denial of a motion for new trial based upon the claim that the jury’s verdict was against the manifest weight of the evidence. Weatherly, 31 So.3d at 805-06. We accordingly affirm the trial court’s denial of a new trial on this ground.
C. Causation
The issue of causation in this wrongful death case turns on whether there was sufficient evidence presented upon which the jury could have found that the security company’s breach of its duty to patrol continuously was the proximate cause of Giangrandi’s death. In wrongful death actions, the plaintiff has the burden of proving that the “wrongful act, negligence, default, or breach of contract or warranty” caused the death. § 768.19, Fla. Stat. (2011). The Florida Supreme Court has recognized that
harm is “proximate” in a legal sense if prudent human foresight would lead one to expect that similar harm is likely to be substantially caused by the specific act or omission in question. In other words, human experience teaches that the same harm can be expected to recur if the same act or omission is repeated in a similar context.
McCain v. Fla. Power Corp., 593 So.2d 500, 503 (Fla.1992).
In Florida, “courts follow the more likely than not standard of causation and require proof that the negligence probably caused the plaintiffs injury.” Gooding v. Univ. Hosp. Bldg., Inc., 445 So.2d 1015, 1018 (Fla.1984). In other words; to establish a jury question on causation, “the plaintiff must show that what was done or failed to be done probably would have affected the outcome.” Id. at 1020. In reviewing causation, we view the facts in the light most favorable to the estate, as the nonmoving party. J.T.A. Factors, Inc. v. Philcon Servs., Inc., 820 So.2d 367, 372 (Fla. 3d DCA 2002) (“When reviewing the denial of a motion for new *1135 trial, we must view the evidence and every conclusion derived therefrom in the light most favorable to [the nonmoving party], and then determine whether the trial court abused its discretion”).
In negligent security cases like this one, which involve a crime inside a dwelling, the presence or absence of a jury issue on causation usually turns on whether sufficient evidence has been presented that connects the negligent security to the perpetrator’s entry into the victim’s residence. Even if a breach of the duty to provide security is clearly established, Florida courts have held that no jury question on causation is presented where a plaintiff cannot establish how the perpetrator gained access to the dwelling. In ERP Operating Limited Partnership v. Sanders, 96 So.3d 929, 933 (Fla. 4th DCA 2012), the Fourth District reversed the trial court’s denial of a directed verdict where “[t]he plaintiffs expert acknowledged that it was unknown what happened on the night of the murders.” The court noted that “[w]ithout proof of how the assailants gained entry into the apartment, the plaintiff simply could not prove causation.” Id. In Brown v. Motel 6 Operating, L.P., 989 So.2d 658, 659 (Fla. 4th DCA 2008), the court affirmed summary judgment on the issue of causation in a negligent security case where “[t]here was no evidence of a forced entry to the decedent’s room, nor any evidence as to any activity other than the shooting.”
But Florida courts have found a jury question on the issue of causation where a plaintiff presents sufficient evidence for a jury to find that the perpetrator gained access to a dwelling in a manner that would have been detected or deterred had the breach in security not occurred. For example, in Holley v. Mt. Zion Terrace Apartments, Inc., 382 So.2d 98, 101 (Fla. 3d DCA 1980), this court reversed a summary judgment entered in favor of a landlord in a negligent security case, where the intruder gained access into the victim’s second story apartment through a window facing a common walkway. This court concluded that “it was for the jury to determine whether the defendant’s alleged breach of duty as to the areas outside the apartment was a legal cause of what happened inside.” Id. Similarly, in Williams v. Office of Security & Intelligence, Inc., 509 So.2d 1282, 1283 (Fla. 3d DCA 1987), review denied, 518 So.2d 1277 (Fla.1987), this court held that a jury question existed on the issue of whether the failure of security guards to conduct regular patrols was the proximate cause of a rape that occurred after an intruder broke into the victim’s apartment. Noting that reasonable individuals can draw various conclusions from the same facts, this court could held it was the role of the jury to weigh and evaluate whether proper security would have detected the break-in or deterred the intruder. Id. at 1283-84.
In this record, the estate presented sufficient evidence for the jury to find that the murderer gained access to Giangran-di’s home in a manner that probably would have been detected or deterred had the breach in security not occurred. The jury heard evidence that the murderer waited outside and finally broke into the home during the time period when the roving guard should have been patrolling, but was not. It also heard evidence that this particular type of opportunistic crime would have been detected or deterred if the guard had been properly patrolling. We cannot state as a matter of law that the occurrence of the burglary at the very time when the breakdown in security occurred could only be a matter of coincidence.
In the final analysis, the sworn statement of the murderer describing how and *1136 when he broke into the home provides the necessary temporal and physical connection that links the failure in security to the criminal’s entry into the dwelling. This evidence places this case within the ambit of Williams and Holley. Because the purpose of a roving patrol is to either detect or deter crime, the jury could reasonably infer that the failure to patrol outside the home during the critical time period created the opportunity for the murderer to break into Giangrandi’s window, and therefore that the security company’s breach was the proximate cause of Giangrandi’s murder. See Williams, 509 So.2d at 1283-84; Holley, 382 So.2d at 101-02.[5]
This result is not changed merely because the security company presented evidence in the form of expert testimony to the effect that the murderer was not deterrable, based upon the contention that the murderer targeted Giangrandi. This evidence was directly contradicted by the opinions of the estate’s experts and, significantly, by the murderer’s sworn statement that he did not know or target Giangrandi. We have little difficulty deciding that it was within the province of the jury to choose which of these conflicting accounts to credit. This is particularly true regarding conflicting expert testimony, and conflicts between an expert’s opinion and lay testimony. Shaw v. Puleo, 159 So.2d 641, 644 (Fla.1964), modified on other grounds, Griffis v. Hill, 230 So.2d 143 (Fla.1969). Moreover,
whei*e reasonable persons could differ as to whether the facts establish proximate causation — i.e., whether the specific injury was genuinely foreseeable or merely an improbable freak — then the resolution of the issue must be left to the fact-finder. The judge is free to take this matter from the fact-finder only where the facts are unequivocal, such as where the evidence supports no more than a single reasonable inference.
McCain, 593 So.2d at 504 (citations omitted). In fact, the Supreme Court has recently confirmed that an appellate court erred when it “reweighed the evidence and substituted its judgment concerning credibility of the witnesses for that of the trier of fact” on the issue of causation. Friedrich v. Fetterman & Assocs., _ So.3d _, _, 2013 WL 5745617, 38 Fla. L. Weekly S768, S770 (Fla. Oct. 24, 2013).
Although the issue of causation is close, we conclude that the trial judge did not abuse his discretion in denying a new trial.
II. Evidentiary Issues
The security company also claims the trial judge committed reversible error by excluding certain evidence, including the proffered testimony of the security company’s expert that Giangrandi was targeted because of her charitable work with the homeless. The matters at issue were excluded because they invited speculation, constituted improper hearsay, or were simply redundant. “Where a trial court has weighed probative value against prejudicial impact before reaching its decision, an appellate court shall not overturn such a decision absent a clear abuse of discretion.” H & H Elec., Inc. v. Lopez, 967 So.2d 345, 347-48 (Fla. 3d DCA 2007). After a careful review of the record, we find no abuse of discretion by the trial court: its decisions on these evidentiary issues were far from being “arbitrary, fanciful, or unreasonable.” Id. at 348 (quot *1137 ing Canakaris v. Canakaris, 382 So.2d 1197, 1203 (Fla.1980)).
Affirmed.
SHEPHERD, C.J., concurs.

. The admissibility of the sworn statement was not challenged on appeal.

. Fabre v. Marin, 623 So.2d 1182 (Fla.1993), receded from in part on other grounds, Wells v. Tallahassee Mem’l Reg'l Med. Ctr., Inc., 659 So.2d 249 (Fla.1995). "A ‘Fabre defendant’ is a non-party defendant whom a party defendant asserts is wholly or partially responsible for the negligence alleged.” Salazar v. Helicopter Structural & Maint., Inc., 986 So.2d 620, 622 n. 1 (Fla. 2d DCA 2007).

. Donald Thompson, the Miami-Dade County official who monitored the performance of security companies, confirmed that the roving guard was required to keep moving. When asked if the roving guard was allowed to stop the vehicle and position themselves to merely observe, he testified, “Not for a lengthy period of time. We understand that, first of all if they're using the radio, the two-way radio, they probably want to stop. They have a logbook. If they’re filling things in there, they’re going to stop and they may stop at an intersection where they can see down the road just for observation purposes, but we don't want them parked.”

. On cross-examination, he expanded on his opinion in this regard:
Q. Now, I think you told us that in your direct that [the murderer] wasn't deterrable unless there was a SWAT and militia team onsite.
A. I think I said the 82nd Airborne as well. SWAT and — that was a characteristic, so—
Q. Nothing is going to deter him other than a SWAT team and troop of bomber planes?
A. Well, 82nd Airborne, I m talking more about the soldiers.
I mean, what I was getting at is, is there is no amount — what I testified to, I believe, is no amount of routine or reasonable security would have deterred him that evening. We need some sort of exceptional security, and those were examples I gave.

. The dissent contends that the roving guard could not view the window while he patrolled the neighborhood because a "wing wall” and a tree obstructed his view. A witness, however, testified that "you have a clear, unobstructed view” of the window from various angles along the street.